LAW OFFICES OF RODNEY
BRIDGERS, L.L.L.C.

Rodney P. Bridgers, Jr. (9505)
707 Richards Street, Suite 526
Honolulu, HI 96813
Tel: (808) 536-3255
Email: rod@helpingemeployyeshi.com

*Attorney for Plaintiff Bryan Meek*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

|  |  |
|---|---|
| BRYAN MEEK, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HAWAIIAN HOLDINGS, INC., PETER R. INGRAM, LAWRENCE S. HERSHFIELD, WENDY A. BECK, EARL E. FRY, JAYNE HRDLICKA, MICHAEL E. MCNAMARA, CRYSTAL K. ROSE, CRAIG E. VOSBURG, RICHARD N. ZWERN, DANIEL W. AKINS, MARK D. SCHNEIDER, and DUANE E. WOERTH,<br><br>Defendants. | Case No.<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Bryan Meek ("Plaintiff"), by his undersigned attorneys, for this Class

Action Complaint against Defendants, alleges upon personal knowledge with

respect to himself, and upon information and belief based upon, *inter alia*, the

1

investigation of counsel, as to all other allegations herein, as follows:

<u>**NATURE OF THE ACTION**</u>

1.      Plaintiff brings this securities class action on behalf of himself and the other public stockholders of Hawaiian Holdings, Inc. ("Hawaiian" or the "Company"), against Hawaiian and the members of the Company's board of directors (the "Board" or the "Individual Defendants") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 (the "federal claims"). Plaintiff also asserts claims against the Individual Defendants for violations of their duty of candor under Delaware law (the "state claim"). Plaintiff's claims arise in connection with the proposed merger (the "Proposed Merger") between Hawaiian and Alaska Air Group, Inc. ("Alaska").

2.      On December 2, 2023, Hawaiian entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Hawaiian shareholders will receive $18.00 in cash for each share of Hawaiian common stock they own (the "Merger Consideration"). Upon the completion of the Proposed Merger, Hawaiian stock will no longer be publicly traded.

3.      On January 9, 2024, to convince Hawaiian stockholders to vote in favor of the Proposed Merger, Defendants authorized the filing of a materially incomplete and misleading definitive proxy statement on Schedule 14A (the "Proxy") with the

Securities and Exchange Commission ("SEC"), in violation of Section 14(a)/Rule 14a-9 and their fiduciary duty of candor.

4.      In particular, the Proxy contains materially omissive and misleading information concerning the financial projections prepared for Hawaiian during its negotiations with Alaska and the valuation analyses prepared by Hawaiian's financial advisor, Barclays Capital Inc. ("Barclays"). Notably, Hawaiian management prepared three sets of long-term financial projections during discussions with Alaska: the August, September, and November Long Term Plans.[1] However, instead of fully disclosing all three Projections – and in stark contrast to the more fulsome disclosure provided to shareholders regarding the November Long Term Plan – the Proxy only provides minimalistic summaries of the August and September Long Term Plans.

5.      As further set forth below, full disclosure of all three Projection sets is necessary because each set was reviewed and approved by Hawaiian's Board, provided to Barclays to analyze Hawaiian's value and the merits of the prospective transaction, provided to Alaska at key moments in the negotiations process, and contained unlevered free cash flow ("UFCF") metrics for Hawaiian from 2023 through 2028. Each forecast thus (i) played a critical role in keeping the Board

---

[1] Collectively, the "Projections", and individually the "August Long Term Plan", "September Long Term Plan", and "November Long Term Plan".

reliably informed about management's distilled expectations concerning Hawaiian's ongoing performance and prospects; and (ii) formed a key part of the financial backdrop to the negotiations between Hawaiian and Alaska's leaders and advisors.

6.     Full disclosure of all three Projection sets is especially important here because the November Long Term Plan substantially reduced certain metrics for the Company during end-stage negotiations once Alaska's final bid became clear, raising the very real possibility that Hawaiian cut its Projections in order to obtain a fairness opinion from Barclays and induce shareholder support for a lower-than-expected bid from Alaska. As further detailed below, negotiations began at $20 per share but ended at $18 per share. Further, certain undisclosed cost-structure and earnings metrics in the September Long Term Plan prompted Alaska to lower its bid in October 2023,[2] meaning that undisclosed metrics in the September Long Term Plans directly contributed to Alaska's bidding decisions.

7.     Given these considerations, the August and September Long Term Plans must be disclosed in full.

8.     In addition, the Proxy fails to disclose key inputs to a comparable companies analyses prepared by Barclays (the "Selected Comparable Company Analysis"), necessitating further corrective disclosure.

9.     The shareholder vote of Company stockholders concerning the

---

[2] Proxy at 37.

Proposed Merger (the "Shareholder Vote") will be held on February 16, 2024. It is thus imperative that the material information that has been omitted from the Proxy be disclosed prior to the Shareholder Vote so that Plaintiff and other Company stockholders can cast informed votes on the Proposed Merger.

10.     For these reasons, Plaintiff seeks expedited discovery in relation to the foregoing omissions, an injunction of the Shareholder Vote until the material information identified herein is disclosed to stockholders, and – in the event the Proposed Merger is consummated without remedial disclosure – to recover damages caused by Defendants' violations.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) because Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

12.     This Court has subject matter jurisdiction over Plaintiff's state claim pursuant to 28 U.S. Code § 1367 (supplemental jurisdiction) because it is so related to Plaintiff's federal claims that it forms part of the same case or controversy.

13.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has

sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman* 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

14.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391 because Defendants are found in or inhabit or transact business in this District.

## **PARTIES**

### I.     **Plaintiff**

15.     Plaintiff Bryan Meek (defined above as "Plaintiff") is, and has been at all relevant times, the owner of Hawaiian common stock.

### II.     **Defendants**

16.     Hawaiian Holdings, Inc. (defined above as "Hawaiian" or the "Company") is a Delaware corporation with principal executive offices located at 3375 Koapaka Street, Suite G-350, Honolulu, HI, 96819.

17.     Defendant Peter R. Ingram is, and has been at all relevant times,

Hawaiian's President, Chief Executive Officer, and a director of the Company.

18.     Defendant Lawrence S. Hershfield is, and has been at all relevant times, the Chairman of Hawaiian's Board of Directors.

19.     Defendant Wendy A. Beck is, and has been at all relevant times, a director of the Company.

20.     Defendant Earl E. Fry is, and has been at all relevant times, a director of the Company.

21.     Defendant Jayne Hrdlicka is, and has been at all relevant times, a director of the Company.

22.     Defendant Michael E. McNamara is, and has been at all relevant times, a director of the Company.

23.     Defendant Crystal K. Rose is, and has been at all relevant times, a director of the Company.

24.     Defendant Craig E. Vosburg is, and has been at all relevant times, a director of the Company.

25.     Defendant Richard N. Zwern is, and has been at all relevant times, a director of the Company.

26.     Defendant Daniel W. Akins is, and has been at all relevant times, a director of the Company.

27.     Defendant Mark D. Schneider is, and has been at all relevant times, a

director of the Company.

28.     Defendant Duane E. Woerth is, and has been at all relevant times, a director of the Company.

29.     The Defendants identified in paragraphs 17 through 28 are collectively referred to herein as the "Board" or the "Individual Defendants."

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTY OF CANDOR

30.     By reason of the Individual Defendants' positions with the Company as directors and/or officers, they were in a fiduciary relationship with Plaintiff and the other Hawaiian public shareholders, and had the power to control and influence Hawaiian, did control and influence Hawaiian, and caused Hawaiian to engage in the practices complained of herein.

31.     In connection with their fiduciary duty of care and loyalty, the Individual Defendants directly owed Plaintiff and all of the Company's shareholders a duty of candor, which required them to disclose fully and fairly all material information within their control when they sought stockholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

32.     Plaintiff alleges herein that Defendants, separately and together, in connection with the Proposed Merger, violated their fiduciary duty of candor owed to the Company's shareholders.

## SUBSTANTIVE ALLEGATIONS

### A.      Background of Hawaiian and Alaska

33.     Hawaiian is Hawaii's largest airline. The Company operates 150 daily flights to four Hawaiian islands, 15 gateway cities on the U.S. mainland, and 10 international destinations in American Samoa, Tahiti, Australia, New Zealand, South Korea, and Japan. It employs approximately 1000 pilots in total and operates a mix of Boeing and Airbus aircraft, specifically 19 Boeing B-717-200s, 18 Airbus A321neos, and 24 Airbus A330-200s (61 aircraft in total). It has upcoming deliveries of 10 Boeing B-787-9s and 10 Airbus A330-300Fs.

34.     Hawaiian generated revenues of approximately $2.65 billion in the financial year ended December 31, 2022.

35.     Alaska operates flights to more than 120 locations in the United States, Belize, Canada, Costa Rica, Mexico, the Bahamas, and Guatemala. The airline employs approximately 3400 pilots in total and primarily operates a Boeing 737 fleet, supplemented by Embraer 175s for regional routes (303 aircraft in total). It has upcoming deliveries of 89 Boeing 737s and 9 Embraer 175s.

36.     Alaska generated revenues of approximately $9.65 billion in the financial year ended December 31, 2022.

### B.      The Negotiation of the Proposed Merger and the Creation of the Company's August, September, and November Long Term Plans

37.     The first disclosed contact between Defendant Ingram (CEO of

Hawaiian) and Ben Minicucci (CEO of Alaska) concerning the Proposed Merger occurred on August 2, 2023, when Minicucci contacted Ingram to request a meeting.

38.     Ingram and Minicucci subsequently met on August 9, 2023. At the meeting, Minicucci expressed Alaska's interest in acquiring Hawaiian for $20.00 per share in cash (the "Initial Proposal").

39.     On August 10, 2023, Minicucci provided Ingram a letter outlining the terms of the Initial Proposal, which Ingram forwarded to the Board.

40.     On August 14, 2023, the Board met, with management and the Company's outside legal advisors, Wilson Sonsini Goodrich & Rosati, P.C. ("Wilson Sonsini"), in attendance. Ingram described the Initial Proposal and his conversation with Minicucci, and the Board instructed Ingram to inform Minicucci that the Board was evaluating the Initial Proposal. The Board also delegated authority to its Executive Committee ("Executive Committee") – composed of Individual Defendants Hershfield, Fry, Ingram – to further evaluate the Initial Proposal.

41.     On August 18 and 21, 2023, the Executive Committee met with Hawaiian management and Wilson Sonsini in attendance to discuss the Company's operating performance and prospects. There, management reviewed an updated draft of Hawaiian management's long-term operating and financial plan for the Company (the **August Long Term Plan**).

42.     On August 22, 2023, the Hawaiian Board met, with management, Wilson Sonsini, and Barclays in attendance. Management reviewed the August Long Term Plan with the Board. It was the consensus of the Hawaiian Board to (1) adopt the August Long Term Plan; (2) direct Barclays to use the August Long Term Plan for purposes of its financial analyses of the Initial Proposal; and (3) when and if appropriate, share the August Long Term Plan with Alaska.

43.     The same day, Ingram informed Minicucci that the Board was evaluating the Initial Proposal but needed time to complete its review.

44.     On August 24, 2023, the Hawaiian Board met, with management and Wilson Sonsini in attendance. Ingram informed the Hawaiian Board that Barclays had begun preparing financial analyses concerning the Initial Proposal based on the August Long Term Plan.

45.     Barclays' analyses concerning the Proposed Merger include a discounted cash flow analysis based on Hawaiian's prospective unlevered free cash flow and a comparable companies analysis based on the Company's adjusted enterprise value as a multiple of 2025 Adjusted EBITDAR.

46.     On August 30, 2023, the Executive Committee met, with management, Wilson Sonsini, and Barclays in attendance. Barclays reviewed its financial analyses of the Initial Proposal based on, among other things, the August Long Term Plan, and the Executive Committee discussed the Initial Proposal.

47.     The Executive Committee decided to recommend to the Hawaiian Board that the Company reject the Initial Proposal as too low but engage with Alaska to allow it to better understand the Company's long-term business plans (including by providing due diligence information) so that Alaska could, if it wished, improve the terms of the Initial Proposal. (Notably, Alaska would ultimately decrease, not increase, its bid).

48.     On September 1, 2023, the Hawaiian Board met, with management, Wilson Sonsini, and Barclays in attendance. Barclays reviewed its financial analyses of the Initial Proposal. Based on the analyses and other considerations, the Executive Committee provided its foregoing recommendation to the Hawaiian Board. The Board accepted the recommendation and instructed Ingram to inform Alaska that the Initial Proposal was not acceptable and that any subsequent acquisition proposal needed to deliver greater value.

49.     On September 4, 2023, Ingram spoke with Minicucci, informed him of the position of the Hawaiian Board on the Initial Proposal, and stated that any revised acquisition proposal should reflect an increase of the offer price into the $20s per share.

50.     On September 15, 2023, Hawaiian management, including Ingram, met with Alaska management, including Minicucci, to discuss Hawaiian and its business. During this meeting, the Company provided Alaska with the August Long

Term Plan.

51.    On September 18, 2023, the Hawaiian Board met, with management and Wilson Sonsini in attendance. Ingram updated the Board on the meeting with Alaska management on September 15, 2023. Hawaiian management also described certain further changes to the August Long Term Plan to reflect revised assumptions regarding the Company's business, although the specific alterations made to the underlying assumptions are not disclosed.

52.    At the meeting, the Board decided to (1) adopt the revised forecasts for the Company as the **September Long Term Plan**; (2) direct Barclays to use the September Long Term Plan for purposes of its financial analyses; and (3) when and if appropriate, share the September Long Term Plan with Alaska.

53.    In the days and weeks following September 18, 2023, Hawaiian management met with Alaska management to discuss diligence information about Hawaiian, including the September Long Term Plan. Hawaiian's and Alaska's financial and legal advisers also attended certain of these meetings. In addition, Alaska received the September Long Term Plan. The specific date the September Long Term Plan was provided to Alaska is not disclosed.

54.    On October 2 and October 9, 2023, the Executive Committee met, with management, Wilson Sonsini, and Barclays in attendance, to discuss the status of negotiations and other matters related to the potential acquisition.

13

55.     On October 24, 2023, Hawaiian held its Q3 2023 earnings call. On the call, Ingram stated that, in the "immediate aftermath" of the Maui wildfires from August 8-11, 2023, "new bookings to Maui slowed to a trickle and [the Company] saw large volumes of close-in cancellations for Maui trips. A portion of this close-in business shifted to other islands, notably Kauai. Booking trends stabilized in the weeks that followed and cancellations have abated but it will be a while yet before demand fully returns to the robust levels we saw earlier in the summer."

56.     Ingram further stated that "load factors, both on our North America and Neighbor Island flights to and from Maui, remain below typical levels but are improving. October will be better than September which at a low point in load factors and the trajectory we're seeing is encouraging."

57.      Ingram also noted that the Company expected to have "between two and four [A321neo] aircraft out-of-service at any point in time over the next few months" (out of eighteen A321neo aircraft operated by Hawaiian in total) in connection with problems with the PW1100G-JM engines used these aircraft.

58.     On October 25, 2023, Ingram and Minicucci spoke. During this conversation, Minicucci stated that Alaska had lowered its acquisition proposal to $17.00 per share in cash (the "First Revised Proposal"). With respect to this lowered acquisition price, Minicucci noted: (1) the higher capital expenditures contemplated by the September Long Term Plan than those assumed by Alaska for the Initial

Proposal; and (2) the lower profitability estimates for Hawaiian during 2024 and 2025 contemplated by the September Long Term Plan as compared to Alaska's assumptions underlying the Initial Proposal.

59.    Later on October 25, 2023, Minicucci provided a non-binding letter outlining the terms of the First Revised Proposal.

60.    On October 26, 2023, the Executive Committee met, with management, Wilson Sonsini, and Barclays in attendance. Ingram reviewed the First Revised Proposal and his related conversation with Minicucci, and the Executive Committee discussed with management the evolving impact on Hawaiian's financial and operational performance of: (1) the wildfires in Lahaina, Maui on August 8, 2023; and (2) anticipated accelerated removals and inspections of a portion of the PW1100G-JM engines used in Hawaiian's eighteen A321neo aircraft.

61.    On November 1 and November 3, 2023, the Executive Committee met, with management, Wilson Sonsini, and Barclays in attendance. Barclays reviewed its financial analyses concerning the First Revised Proposal (which analyses were based on, among other things, the September Long Term Plan). It was the consensus of the Executive Committee to recommend to the Hawaiian Board that it make a counterproposal to Alaska for an acquisition at $18.50 per share in cash.

62.     On November 6, 2023, the Hawaiian Board met, with management, Wilson Sonsini, and Barclays in attendance. There, Ingram reviewed the First Revised Proposal, and Barclays reviewed its financial analyses of the First Revised Proposal (which analyses were based on, among other things, the September Long Term Plan). The Executive Committee provided its recommendation to the Hawaiian Board that Hawaiian make a counterproposal to Alaska for an acquisition at $18.50 per share in cash.

63.     It was the consensus of the Hawaiian Board to accept the recommendation of the Executive Committee, and the Hawaiian Board instructed Ingram to relay this counterproposal to Alaska.

64.     Later that day, Ingram communicated the counterproposal for an acquisition at $18.50 per share in cash.

65.     On November 7, 2023, Ingram and Minicucci spoke on two occasions. During the first discussion, Minicucci proposed that Alaska would acquire Hawaiian for $17.50 per share in cash. In response, Ingram said that he did not wish to bring a proposal to the Hawaiian Board that contemplated an acquisition below $18.00 per share. Minicucci responded that he was willing to increase the per share value of Alaska's proposal to $18.00 (the "Second Revised Proposal"), but only if the two parties aligned on these terms that day. Ingram then discussed the Second Revised Proposal with the other members of the Executive Committee. Each

member of the Executive Committee concluded that the Second Revised Proposal provided a sufficient basis for the Company to provide Alaska with additional due diligence information and for the parties to undertake additional work in support of reaching a transaction.

66.    On November 9, 2023, Hawaiian opened an online data room to Alaska, which contained additional due diligence information.

67.    On November 14, 2023, Alaska's legal advisors distributed a draft merger agreement to Wilson Sonsini.

68.    On November 15, 2023, during a regularly scheduled meeting of the Hawaiian Board, with management, Wilson Sonsini, and Barclays in attendance, Ingram described the Second Revised Proposal and his conversations with Minicucci. The Hawaiian Board expressed its concurrence with the Executive Committee's position that the Second Revised Proposal provided a sufficient basis for Hawaiian to provide Alaska with additional due diligence information and for the parties to undertake additional work in support of reaching a transaction.

69.    On November 20, 2023, the Executive Committee met, with members of Hawaiian management, Wilson Sonsini, and Barclays in attendance. The Executive Committee discussed the draft merger agreement. Wilson Sonsini distributed a revised draft of the merger agreement to Alaska's legal advisors the next day.

70.    On November 24 and 25, 2023, Ingram and Minicucci spoke

regarding remaining open points in the merger agreement.

71.    On November 27, 2023, the Executive Committee met, with management, Wilson Sonsini, and Barclays in attendance. Ingram reviewed the current status of negotiations and summarized his conversations on November 24 and November 25, 2023 with Minicucci. Further, Hawaiian management discussed an updated long-term operating and financial plan for Hawaiian (the November Long Term Plan).

72.    The Executive Committee adopted the November Long Term Financial Plan and determined that (1) the differences between the September Long Term Plan and the November Long Term Plan should be shared with Alaska and its advisers; and (2) Barclays should use the November Long Term Plan for purposes of its financial analyses of the proposed acquisition.

73.    On November 28, 2023, the differences between the September Long Term Plan and the November Long Term Plan were shared with Alaska and its advisers. Further specifics about this discussion and how these differences were described to Alaska are not disclosed.

74.    Notwithstanding the reductions made in the November Long Term Plan, Alaska did not seek to renegotiate its bid, indicating that the August and September Long Term Plans remained reliable forecasts of Hawaiian's prospects.

75.    On November 30, 2023, the Executive Committee met, with

management, Wilson Sonsini, and Barclays in attendance. The Executive Committee discussed the draft merger agreement and the status of the proposed acquisition by Alaska.

76.     On December 1, 2023, the Hawaiian Board met, with management, Wilson Sonsini, and Barclays in attendance. Barclays reviewed its financial analyses of the proposed acquisition based on, among other things, the November Long Term Plan. Following the meeting, Hawaiian management, Wilson Sonsini, Alaska management, and Alaska's counsel, finalized the merger agreement.

77.     On December 2, 2023, the Hawaiian Board met, with management, Wilson Sonsini, and Barclays in attendance. At the meeting, Barclays rendered its oral opinion, subsequently confirmed in writing, that, as of December 2, 2023, the per share consideration of $18.00 in cash to be offered to Hawaiian's stockholders was purportedly fair from a financial point of view. Based on that finding, the Board authorized the Company to enter the Merger Agreement, which Hawaiian and Alaska subsequently signed.

78.     On December 3, 2023, the Company and Alaska issued a press release announcing the Proposed Merger.

**C.     The Proxy Omits Material Information**

79.     The Proxy critically omits the complete August and September Long Term Plans. These Projections contain UFCF forecasts and other metrics for

Hawaiian relating to the Proposed Merger, the Company's value, and the fairness of the Merger Consideration. Indeed, the Proxy indicates that Company management provided Barclays with the August and September Long Term Plans and that Barclays used both sets of Projections to prepare analyses concerning the Hawaiian's value and the fairness of a potential merger, yet neither the August nor September Long Term Plans are fully disclosed in the Proxy.

80.  The August Long Term Plan is presently summarized as follows:

The following table summarizes the August 2023 Long-Term Plan. Hawaiian management made various estimates and assumptions when preparing the August 2023 Long-Term Plan, including (1) growth in premium aircraft seats, stronger unit revenue inflation for North America travel and generally consistent revenues for international travel over the performance period; (2) certain other revenue opportunities from new products and merchandising improvements; (3) labor costs based on agreed contract terms, with labor productivity gradually advancing toward pre-pandemic levels and slower non-contract headcount growth over the performance period; (4) fuel costs based on the then-current fuel curve and an assumed one percent reduction in fuel usage over the performance period; (5) a three percent annual inflation rate applied to approximately 10 percent of overall operating expenses; and (6) certain other cost saving opportunities. The August 2023 Long-Term Plan did not include any impact of the External Events.

| (dollars in millions) | Fiscal year ending December 31, | | | | | |
| | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
| Revenue | $2,823 | $3,211 | $3,441 | $3,828 | $4,107 | $4,330 |
| Adjusted EBITDAR[1] | $ 53 | $ 233 | $ 425 | $ 630 | $ 732 | $ 812 |

81.  The September Long Term Plan is presently summarized as follows:

The following table summarizes the September 2023 Long-Term Plan. The September 2023 Long-Term Plan includes updates by Hawaiian management to reflect (1) immaterial refinements and (2) updated assumptions underlying our cargo business with Amazon. The September 2023 Long-Term Plan was otherwise prepared using assumptions that are consistent with the August 2023 Long-Term Plan. As with the August 2023 Long-Term Plan, the September 2023 Long-Term Plan did not include any impact of the External Events.

| (dollars in millions) | Fiscal year ending December 31, | | | | | |
| | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
| Revenue | $2,823 | $3,211 | $3,462 | $3,843 | $4,123 | $4,358 |
| Adjusted EBITDAR[1] | $ 53 | $ 233 | $ 463 | $ 655 | $ 758 | $ 840 |

(1)   Adjusted EBITDAR is defined as earnings adjusted for interest expense, taxes, depreciation and amortization, aircraft rent expense, non-recurring operating expenses (such as changes in unrealized gains and losses on financial instruments) and one-time charges.

82.  In contrast, the November Long Term Plan is fully disclosed as follows, with all metrics used to derive unlevered free cash flow revealed to shareholders.

The following table summarizes the November 2023 Long-Term Plan. The November 2023 Long-Term Plan included estimated unlevered free cash flow for fiscal years 2023 through 2028 and net operating loss carryover utilization for fiscal years 2023 through 2030 for use by Barclays in connection with its opinion delivered to the Hawaiian Board (as described in more detail in the section of this proxy statement captioned "—Opinion of Barclays Capital Inc."). The November 2023 Long-Term Plan was updated by Hawaiian management to reflect: (1) specific operating and financial impacts of the External Factors; (2) actual results for the third quarter of 2023; and (3) an updated fuel cost curve. The November 2023 Long-Term Plan otherwise was prepared using assumptions consistent with the September 2023 Long-Term Plan.

| | Fiscal year ending December 31, | | | | | |
|---|---|---|---|---|---|---|
| (dollars in millions) | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
| Revenue | $2,749 | $3,160 | $3,462 | $3,843 | $4,123 | $4,358 |
| Adjusted EBITDAR[1] | $ (95) | $ 13 | $ 349 | $ 567 | $ 700 | $ 808 |
| Adjusted EBIT[2] | $ (338) | $ (244) | $ 87 | $ 293 | $ 420 | $ 518 |
|    Unlevered Cash Taxes[3] | $ 0 | $ 0 | $ (18) | $ (61) | $ (88) | $ (109) |
|    Depreciation & Amortization | $ 136 | $ 150 | $ 173 | $ 194 | $ 214 | $ 233 |
|    Capital Expenditures | $ (262) | $ (646) | $ (608) | $ (523) | $ (386) | $ (274) |
|    Decrease in Working Capital[4] | $ 109 | $ 30 | $ 145 | $ 35 | $ 33 | $ 64 |
| Unlevered Free Cash Flow | $ (355) | $ (710) | $ (221) | $ (64) | $ 193 | $ 432 |
| Tax Savings from Net Operating Loss Utilization[5] | $ 0 | $ 0 | $ 0 | $ 27 | $ 44 | $ 53 |

(1)   Adjusted EBITDAR is defined as earnings adjusted for interest income, interest expense, taxes, depreciation and amortization, aircraft rent expense, non-recurring operating expenses (such as changes in unrealized gains and losses on financial instruments) and one-time charges.
(2)   Adjusted EBIT is defined as Adjusted EBITDAR less depreciation and amortization and aircraft rent expense.
(3)   Unlevered Cash Taxes is defined as Adjusted EBIT multiplied by the effective tax rate. Assumes an effective tax rate of 21 percent.
(4)   Working Capital is defined as the change in operating assets and liabilities.
(5)   Assumes an 80 percent annual limitation on the offset of net operating loss carryovers against annual taxable income and an effective tax rate of 21 percent.

83.   The omission of the foregoing metrics for Adjusted EBIT, Unlevered Cash Taxes, Depreciation and Amortization, Capital Expenditures, Decrease in Working Capital, Tax Savings from Net Operating Loss Utilization, and (especially) Unlevered Free Cash Flow (as defined above, "UFCF") from the summaries of the August and September Long Term Plans leaves shareholders unable to conduct an apples-to-apples comparison of each set of the Projections. Notably, as is evident above, Hawaiian's UFCF forecasts are only disclosed for the November Long Term Plan, not the August or September Long Term Plans.

84.   The Proxy confirms that the Company's UFCF metrics were a primary input to the discounted cash flow analysis Barclays prepared concerning Hawaiian's value and presented to the Board. According to the Proxy:

*Discounted Cash Flow Analysis*

In order to estimate the present value of our common stock, Barclays performed a discounted cash flow analysis of Hawaiian. A discounted cash flow analysis is a traditional valuation methodology used to derive a valuation of an asset by calculating the "present value" of estimated future cash flows of the asset. "Present value" refers to the current value of future cash flows or amounts and is obtained by discounting those future cash flows or amounts by a discount rate that takes into account macroeconomic assumptions and estimates of risk, the opportunity cost of capital, expected returns and other appropriate factors.

To calculate the estimated enterprise value of Hawaiian using the discounted cash flow method, Barclays added (1) Hawaiian's projected after-tax unlevered free cash flows for the fourth quarter of fiscal year 2023 through the end of fiscal year 2028 based on the November 2023 Long-Term Plan to (2) the "terminal value" of Hawaiian as of the end of fiscal year 2028 and (3) the present value of the expected utilization of certain net operating losses derived from the NOL Projections, and discounted such amount to its present value using a range of selected discount rates. The after-tax unlevered free cash flows were calculated by taking the projected total Adj. EBITDAR and subtracting rent expenses, unlevered cash taxes and capital expenditures, adding back depreciation and amortization and adjusting for the impact of changes in net working capital. The residual value of Hawaiian at the end of the forecast period, or "terminal value," was estimated by selecting a range of terminal value multiples based on estimated last twelve months Adj. EBITDAR (which we refer to as "**LTM Adj. EBITDAR**") of 4.0x to 5.0x, which was derived by analyzing historical average LTM Adj. EBITDAR multiples for Hawaiian and applying such range to Hawaiian's 2028 estimated LTM Adj. EBITDAR, as set out in the November 2023 Long-Term Plan. The range of after-tax discount rates of 15.5 percent to 18.5 percent was selected based on an analysis of the weighted average cost of capital of Hawaiian and the comparable companies. Barclays then calculated a range of implied prices per share of Hawaiian by subtracting total net debt as of September 30, 2023, from the estimated enterprise value using the discounted cash flow method and dividing such amount by the fully diluted number of shares of our common stock. These calculations resulted in a range of implied price per share of $3 to $14. Barclays noted that on the basis of the discounted cash flow analysis, the per share price of $18 was above the range of implied values per share calculated using the November 2023 Long-Term Plan.

85.    Full disclosure of Hawaiian's withheld UFCF forecasts are especially material because of the importance of these metrics to the discounted cash flow analyses Barclays prepared during negotiations, as set forth above.

86.    As the technique's name suggests, a discounted cash flow analysis calculates the value of a business based upon the present value of the business's projected future unlevered free cash flows. Conceptually, free cash flow represents bottom-line earnings  available for distribution to shareholders through dividends or share buybacks by the company (or, alternatively, earnings that can be retained by a company and thereby cause the company's value to appreciate).

87.    Since discounted cash flow analysis considers the current value of the value a company can be expected to generate for its owners, the method is generally considered the most fundamental approach to rational corporate valuation. Rational stockholders invest in companies based on the value that they believe that a company

can generate for them; discounted cash flow analysis aims to calculate what that value is worth paying for now.[3] [4]

88.    Here, the unlevered free cash flow estimates contained in the August Long Term Plan were used in analyses presented to the Board on August 30 and September 1, 2023, and the unlevered free cash flow estimates contained in the September Long Term Plan were used in analyses presented to the Board on November 1, 3, and 6, 2023. These metrics are not disclosed in the Proxy's summary of the August and September Long Term Plans.

89.    For these reasons and the further reasons explained above, the summaries of the August and September Long Term Plans are materially omissive and thus misleading.

90.    In addition to the above omissions, the Proxy fails to disclose the

---

[3]  "Discounted cash flow (DCF) forms the core of finance…. Though professionals may employ other methods of valuation, such as relative valuation and the contingent claims approach, DCF forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact that it provides a linchpin to link various fields of finance." "Developing an Automated discounted Cash Flow Model." The Valuation Handbook: Valuation Techniques from Today's Top Practitioners. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 110.

[4]  "While discounted cash flow valuation is only one of the three ways of approaching valuation and most valuations done in the real world are relative valuations, it is the foundation on which all other valuation approaches are built. To do relative valuation correctly, we need to understand the fundamentals of discounted cash flow valuation. This is why so much of this book focuses on discount cash flow valuation." Damodaran, Aswath. "Approaches to Valuation." Investment Valuation. 2nd ed. 11.

individual 2025E Adj. EV/EBITDAR multiples observed for the comparable companies studied in Barclay's Selected Comparable Company Analysis, depriving shareholders of key information considered by Barclays in that analysis.

91.     Accordingly, Defendants must be enjoined from holding the Shareholder Vote, unless and until Hawaiian publicly discloses the foregoing information prior to the Shareholder Vote so the Company's shareholders can cast a fully informed vote on the Proposed Merger.

92.     In sum, the Defendants violated Section 14(a)/Rule 14a-9 and breached their fiduciary duty of candor by omitting the foregoing information. Without the disclosure of this material information prior to the Shareholder Vote, Plaintiff and the Company's shareholders cannot cast an informed vote on the Proposed Merger, warranting the injunctive relief sought herein.

## CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this action on behalf of himself and as a class action pursuant to Fed. R. Civ. P. 23 on behalf of all holders of Hawaiian common stock who have been or will be harmed by Defendants' conduct as described herein (the "Class").   Excluded from the Class are Defendants and any individual or entity affiliated with any Defendant.

94.     This action is properly maintainable as a class action because:

(a)   The Class is so numerous that joinder of all members is impracticable.  As of the record date of January 3, 2024, there were approximately 51,824,365 shares of Hawaiian common stock outstanding and entitled to vote, held by thousands of shareholders scattered throughout the United States;

(b)   There are questions of law and fact that are common to the Class, and which predominate over questions affecting any individual Class member.  The common questions include the following:

   (i) Whether Defendants violated Section 14(a)/Rule 14a-9 and/or breached their fiduciary duty of candor owed to Plaintiff and the Class; and

   (ii) Whether Plaintiff and the Class would suffer irreparable injury if the Proposed Merger is completed without corrective disclosures being issued;

(c)   Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class; and

(d)   Plaintiff has retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

95.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class. Thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

96.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

### COUNT I
### Against All Defendants for Violations of Section 14(a) of the Exchange Act

97.     Plaintiff reiterates each and every allegation set forth above as if fully set forth herein.

98.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

99.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the

Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

100.   The omission of information from a proxy will violate Section 14(a) if other SEC regulations specifically require disclosure of the omitted information.

101.   Defendants issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Merger. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections; and (ii) valuation analyses performed by the Company's financial advisor.

102.   In so doing, Defendants made misleading statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

103.   The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted

from the Proxy, yet failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

104.   The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that the Company's financial advisor reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the financial advisor, as well as the fairness opinion and the assumptions made and matters considered in connection therewith.

105.   Further, the Individual Defendants had knowledge of the process leading to the signing of the merger agreement. The Individual Defendants thus knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above materially incomplete and misleading.

106.   The Individual Defendants were each required to review the financial analyses conducted in connection with the fairness opinion and be particularly attentive to the procedures followed in preparing the Proxy and review the Proxy carefully before the Proxy was disseminated, to corroborate that there were no

material misstatements or omissions.

107.   The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders that contains materially false or misleading statements or omits a material fact constitutes negligence. The Individual Defendants were negligent, as Company officers and/or directors, in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon review.

108.   Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation and review of the Company's financial projections.

109.   The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of the right to cast an informed vote on the Proposed Merger if such misrepresentations and omissions are not corrected prior to the vote.

110.   Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT II**
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

111.   Plaintiff reiterates each and every allegation set forth above as if fully

set forth herein.

112. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that are materially incomplete and misleading.

113. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

114. In particular, each of the Individual Defendants had direct supervision of the Company's daily operations and is therefore presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

115. In addition, as the Proxy sets forth at length, and as described herein, the

Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

116.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act. The Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

117.   Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT III**
**Against the Individual Defendants for Breach of their Fiduciary Duty of Candor**

118.   Plaintiff reiterates each and every allegation set forth above as if fully set forth herein.

119.   As directors and/or officers of the Company, the Individual Defendants violated their fiduciary duty of candor owed to the Company's public stockholders.

120.   Indeed, the Individual Defendants directly owed Plaintiff and all Company stockholders a fiduciary duty of care and loyalty, which required them to disclose fully and fairly all material information within their control when they sought shareholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

121.   The Individual Defendants breached their fiduciary duty of candor by approving and/or causing the materially deficient Proxy to be disseminated to Plaintiff and the Class, as detailed herein.

122.   The misrepresentations and omissions in the Proxy are material, and Plaintiff and the Class will be deprived of their right to properly decide whether to cast their vote in favor of the Proposed Merger if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses – the right to properly decide whether to vote in favor of a merger – the harm suffered is an individual and irreparable one.

123.   Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands relief in his favor and in favor of the Class and against Defendants as follows:

A.      Declaring that this action is properly maintainable as a class action and certifying Plaintiff as Class representative;

B.      Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from holding the Shareholder Vote, unless and until the Company discloses the complete August and September Long Term Plans (including the unlevered free cash flow projections contained therein), among other material information, that has been omitted from the Proxy;

C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

D.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff prays for a jury trial on all issues and in all proceedings so triable.

Dated: January 19, 2024

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
Jonathan T. Lerner
The Empire State Building
350 Fifth Avenue, Suite 4740
New York, NY 10118
Tel: (212) 971-1341
jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com
jlerner@monteverdelaw.com

*Attorneys for Plaintiff Bryan Meek*

Respectfully submitted,

**LAW OFFICES OF RODNEY BRIDGERS, L.L.L.C.**

*Rodney P. Bridgers, Jr.*
Rodney P. Bridgers, Jr.
707 Richards Street, Suite 526
Honolulu, HI 96813
Tel: (808) 436-3255
rod@helpingemployeehi.com

*Attorney for Plaintiff Bryan Meek*

34