LAW OFFICES OF RODNEY
BRIDGERS, L.L.L.C.

Rodney P. Bridgers, Jr. (9505)
707 Richards Street, Suite 526
Honolulu, HI 96813
Tel: (808) 536-3255
rod@helpingemployeeshi.com

*OF COUNSEL MONTEVERDE & ASSOCIATES PC*
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4740
New York, NY 10118
Tel: (212) 971-1341
jmonteverde@monteverdelaw.com

Attorneys for Plaintiffs
BRYAN MEEK and
MONTEVERDE &
ASSOCIATES PC

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BRYAN MEEK, and MONTEVERDE & ASSOCIATES PC,<br><br>        Plaintiffs,<br>  v. | Case No.: CV-24-00031 DKW-KJM<br><br><br>**<u>AMENDED COMPLAINT</u>**<br><br><br>**JURY TRIAL DEMANDED** |

HAWAIIAN HOLDINGS, INC., PETER R. INGRAM, LAWRENCE S. HERSHFIELD, WENDY A. BECK, EARL E. FRY, JAYNE HRDLICKA, MICHAEL E. MCNAMARA, CRYSTAL K. ROSE, CRAIG E. VOSBURG, RICHARD N. ZWERN, DANIEL W. AKINS, MARK D. SCHNEIDER, and DUANE E. WOERTH,

Defendants.

Plaintiffs Bryan Meek ("Plaintiff Meek") and Plaintiff Monteverde & Associates PC ("Plaintiff Monteverde") (together, "Plaintiffs"), by their undersigned attorneys, for this Amended Complaint against Defendants, allege upon personal knowledge with respect to themselves, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     On January 19, 2024, Plaintiff Meek filed a class action complaint ("Complaint") on behalf of himself and the other public stockholders of Hawaiian Holdings, Inc. ("Hawaiian" or the "Company") against Hawaiian and the members of the Company's board of directors (the "Board" or the "Individual Defendants") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 and for violations of the Board's duty of candor under Delaware law. These violations arose in connection with Hawaiian's misleading and incomplete

disclosures concerning a proposed merger (the "Merger") between Hawaiian and Alaska Air Group, Inc. ("Alaska").

2.      On December 2, 2023, Hawaiian entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Hawaiian shareholders were slated to receive $18.00 in cash for each share of Hawaiian common stock they owned (the "Merger Consideration"). Upon the completion of the Merger, Hawaiian stock will no longer be publicly traded.

3.      On January 9, 2024, to convince Hawaiian stockholders to vote in favor of the Merger, Defendants authorized the filing of a materially incomplete and misleading definitive proxy statement on Schedule 14A (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Section 14(a)/Rule 14a-9 and their fiduciary duty of candor.

4.      In particular, the Proxy contained materially omissive and misleading information concerning the financial projections prepared for Hawaiian during its negotiations with Alaska and the valuation analyses prepared by Hawaiian's financial advisor, Barclays Capital Inc. ("Barclays"). Notably, Hawaiian management prepared three sets of long-term financial projections during discussions with Alaska: the August, September, and November Long Term Plans.[1]

---

[1] Collectively, the "Projections", and individually the "August Long Term Plan", "September Long Term Plan", and "November Long Term Plan".

5.      However, instead of fully disclosing all three Projections – and in stark contrast to the more fulsome disclosure provided to shareholders regarding the November Long Term Plan – the Proxy only provided minimalistic summaries of the August and September Long Term Plans.

6.      The Proxy further failed to disclose key inputs to a comparable companies analyses prepared by Barclays (the "Selected Comparable Company Analysis"), necessitating further corrective disclosure.

7.      As further set forth below, Plaintiffs stepped in to correct these material omissions by filing the Complaint and an ex-parte motion for limited expedited discovery of Hawaiian's books and records.

8.      Subsequently, following negotiations between Plaintiff Monteverde and Hawaiian's representatives, Hawaiian (i) produced significant financial materials to Plaintiffs on January 31, 2024; and (ii) filed supplemental disclosures with the Securities and Exchange Commission on February 6, 2024 ("Supplemental Disclosures"). A true and complete copy of the Supplemental Disclosures is annexed as **Exhibit A**.

9.      The Supplemental Disclosures contained the information omitted from the Proxy, thereby mooting the Complaint.

10.      On February 16, 2024, armed with the information contained in the Supplemental Disclosures obtained by Plaintiffs, Hawaiian's stockholders cast fully and fairly informed votes in favor of the Merger (the "Shareholder Vote").

11.     For these reasons, and as detailed herein, Plaintiffs seek an award of attorneys' fees and expenses (the "Mootness Fee Award") in connection with the substantial benefit conferred on Hawaiian's shareholders by the Supplemental Disclosures.

## JURISDICTION AND VENUE

12.     This Court possessed subject matter jurisdiction over the federal claims asserted in the Complaint pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) because Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

13.     Further, this Court possessed subject matter jurisdiction over the Delaware law claims asserted in the Complaint pursuant to 28 U.S.C. § 1367 because they were so related to the federal claims as to form part of the same case or controversy.

14.     The Court maintains subject matter jurisdiction over Plaintiffs' Amended Complaint based on its common law ancillary jurisdiction over attorney fee proceedings collateral to the underlying litigation. *See*, *K.C. v. Torlakson*, 762 F.3d 963, 966-68 (9th Cir. 2014).

15.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction

over the Defendants by this Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this District because Defendants are found in or inhabit or transact business in this District.

## PARTIES

### I.     Plaintiffs

17.     Plaintiff Bryan Meek (defined above as "Plaintiff Meek") is, and has been at all relevant times, the owner of Hawaiian common stock.

18.     Plaintiff Monteverde & Associates PC (defined above as "Plaintiff Monteverde") is, and has been at all relevant times, a securities class action law firm.

### II.     Defendants

19.     Hawaiian Holdings, Inc. (defined above as "Hawaiian" or the "Company") is a Delaware corporation with principal executive offices located at 3375 Koapaka Street, Suite G-350, Honolulu, HI, 96819.

20.     Defendant Peter R. Ingram is, and has been at all relevant times, Hawaiian's President, Chief Executive Officer, and a director of the Company.

21.     Defendant Lawrence S. Hershfield is, and has been at all relevant times, the Chairman of Hawaiian's Board of Directors.

22.     Defendant Wendy A. Beck is, and has been at all relevant times, a director of the Company.

23.     Defendant Earl E. Fry is, and has been at all relevant times, a director of the Company.

24.     Defendant Jayne Hrdlicka is, and has been at all relevant times, a director of the Company.

25.     Defendant Michael E. McNamara is, and has been at all relevant times, a director of the Company.

26.     Defendant Crystal K. Rose is, and has been at all relevant times, a director of the Company.

27.     Defendant Craig E. Vosburg is, and has been at all relevant times, a director of the Company.

28.     Defendant Richard N. Zwern is, and has been at all relevant times, a director of the Company.

29.     Defendant Daniel W. Akins is, and has been at all relevant times, a director of the Company.

30.     Defendant Mark D. Schneider is, and has been at all relevant times, a director of the Company.

31.     Defendant Duane E. Woerth is, and has been at all relevant times, a director of the Company.

## **SUBSTANTIVE ALLEGATIONS**

### **A.     Background of the Merger**

32.     On December 2, 2023, Hawaiian and Alaska entered into the Merger

Agreement. The next day, December 3, 2023, the two companies published a joint

press release announcing the Merger.

> **Alaska Airlines and Hawaiian Airlines to Combine, Expanding Benefits and Choice for Travelers Throughout Hawai'i and the West Coast**
>
> SEATTLE and HONOLULU, Dec. 3, 2023 /PRNewswire/ -- Alaska Air Group, Inc. (NYSE: ALK), and Hawaiian Holdings, Inc. (NASDAQ: HA) today announced that they have entered into a definitive agreement under which Alaska Airlines will acquire Hawaiian Airlines for $18.00 per share in cash, for a transaction value of approximately $1.9 billion, inclusive of $0.9 billion of Hawaiian Airlines net debt. The combined company will unlock more destinations for consumers and expand choice of critical air service options and access throughout the Pacific region, Continental United States and globally. The transaction is expected to enable a stronger platform for growth and competition in the U.S., as well as long-term job opportunities for employees, continued investment in local communities and environmental stewardship.
>
> As airlines rooted in the 49th and 50th U.S. states, which are uniquely reliant upon air travel, Alaska Airlines and Hawaiian Airlines share a deep commitment to caring for their employees, guests and communities. This combination will build on the 90+ year legacies and cultures of these two service-oriented airlines, preserve both beloved brands on a single operating platform, and protect and grow union-represented jobs and economic development opportunities in Hawai'i, with a combined network that will provide more options and added international connectivity for travelers through airline partners including, the oneworld Alliance.
>
> "This combination is an exciting next step in our collective journey to provide a better travel experience for our guests and expand options for West Coast and Hawai'i travelers," said Ben Minicucci, Alaska Airlines CEO. "We have a longstanding and deep respect for Hawaiian Airlines, for their role as a top employer in Hawai'i, and for how their brand and people carry the warm culture of aloha around the globe. Our two

airlines are powered by incredible employees, with 90+ year legacies and values grounded in caring for the special places and people that we serve. I am grateful to the more than 23,000 Alaska Airlines employees who are proud to have served Hawaiʻi for over 16 years, and we are fully committed to investing in the communities of Hawaiʻi and maintaining robust Neighbor Island service that Hawaiian Airlines travelers have come to expect. We look forward to deepening this stewardship as our airlines come together, while providing unmatched value to customers, employees, communities and owners."

"Since 1929, Hawaiian Airlines has been an integral part of life in Hawaiʻi, and together with Alaska Airlines we will be able to deliver more for our guests, employees and the communities that we serve," said Peter Ingram, Hawaiian Airlines President and CEO. "In Alaska Airlines, we are joining an airline that has long served Hawaiʻi and has a complementary network and a shared culture of service. With the additional scale and resources that this transaction with Alaska Airlines brings, we will be able to accelerate investments in our guest experience and technology, while maintaining the Hawaiian Airlines brand. We are also pleased to deliver significant, immediate and compelling value to our shareholders through this all-cash transaction. Together, Hawaiian Airlines and Alaska Airlines can bring our authentic brands of hospitality to more of the world while continuing to serve our valued local communities."

33.     Hawaiian is Hawaii's largest airline. The Company operates 150 daily flights to four Hawaiian islands, 15 gateway cities on the U.S. mainland, and 10 international destinations in American Samoa, Tahiti, Australia, New Zealand, South Korea, and Japan. It employs approximately 1000 pilots in total and operates a mix of Boeing and Airbus aircraft, specifically 19 Boeing B-717-200s, 18 Airbus A321neos, and 24 Airbus A330-200s (61 aircraft in total). It has upcoming deliveries of 10 Boeing B-787-9s and 10 Airbus A330-300Fs.

34.    Alaska operates flights to more than 120 locations in the United States, Belize, Canada, Costa Rica, Mexico, the Bahamas, and Guatemala. The airline employs approximately 3400 pilots in total and primarily operates a Boeing 737 fleet, supplemented by Embraer 175s for regional routes (303 aircraft in total). It has upcoming deliveries of 89 Boeing 737s and 9 Embraer 175s.

## B.    Plaintiffs are Entitled to a Reasonable Award of Attorneys' Fees and Expenses in Connection with the Supplemental Disclosures

35.    Plaintiffs are entitled to the Mootness Fee Award because their expedient pursuit of the Complaint caused Defendants to file Supplemental Disclosures with the SEC that provided shareholders and the market crucial information omitted from the Proxy.

36.    The Proxy materially omitted (i) UFCF metrics and further financial information from the summary of the August and September Long Term Plans; and (ii) the individual 2025E Adj. EV/EBITDAR multiples observed by Barclays for each studied public company from its summary of Barclays' Selected Comparable Company Analysis.

37.    Plaintiffs demanded and obtained supplemental disclosures regarding these omissions, thereby delivering a substantial benefit to Hawaiian stockholders.

### (i)    The Material Disclosure of the *Complete* August and September Long Term Plans

38.    The August and September Long Term Plans were originally

omissively summarized in the Proxy as follows.

## August Long Term Plan (original omissive summary)

The following table summarizes the August 2023 Long-Term Plan. Hawaiian management made various estimates and assumptions when preparing the August 2023 Long-Term Plan, including (1) growth in premium aircraft seats, stronger unit revenue inflation for North America travel and generally consistent revenues for international travel over the performance period; (2) certain other revenue opportunities from new products and merchandising improvements; (3) labor costs based on agreed contract terms, with labor productivity gradually advancing toward pre-pandemic levels and slower non-contract headcount growth over the performance period; (4) fuel costs based on the then-current fuel curve and an assumed one percent reduction in fuel usage over the performance period; (5) a three percent annual inflation rate applied to approximately 10 percent of overall operating expenses; and (6) certain other cost saving opportunities. The August 2023 Long-Term Plan did not include any impact of the External Events.

| (dollars in millions) | Fiscal year ending December 31, | | | | | |
| | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
|---|---|---|---|---|---|---|
| Revenue | $2,823 | $3,211 | $3,441 | $3,828 | $4,107 | $4,330 |
| Adjusted EBITDAR[1] | $ 53 | $ 233 | $ 425 | $ 630 | $ 732 | $ 812 |

## September Long Term Plan (original omissive summary)

The following table summarizes the September 2023 Long-Term Plan. The September 2023 Long-Term Plan includes updates by Hawaiian management to reflect (1) immaterial refinements and (2) updated assumptions underlying our cargo business with Amazon. The September 2023 Long-Term Plan was otherwise prepared using assumptions that are consistent with the August 2023 Long-Term Plan. As with the August 2023 Long-Term Plan, the September 2023 Long-Term Plan did not include any impact of the External Events.

| (dollars in millions) | Fiscal year ending December 31, | | | | | |
| | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
|---|---|---|---|---|---|---|
| Revenue | $2,823 | $3,211 | $3,462 | $3,843 | $4,123 | $4,358 |
| Adjusted EBITDAR[1] | $ 53 | $ 233 | $ 463 | $ 655 | $ 758 | $ 840 |

---
(1)    Adjusted EBITDAR is defined as earnings adjusted for interest expense, taxes, depreciation and amortization, aircraft rent expense, non-recurring operating expenses (such as changes in unrealized gains and losses on financial instruments) and one-time charges.

39.    In contrast, the November Long Term Plan was fully disclosed as follows, with all metrics used to derive unlevered free cash flow revealed to shareholders.

The following table summarizes the November 2023 Long-Term Plan. The November 2023 Long-Term Plan included estimated unlevered free cash flow for fiscal years 2023 through 2028 and net operating loss carryover utilization for fiscal years 2023 through 2030 for use by Barclays in connection with its opinion delivered to the Hawaiian Board (as described in more detail in the section of this proxy statement captioned "—Opinion of Barclays Capital Inc."). The November 2023 Long-Term Plan was updated by Hawaiian management to reflect: (1) specific operating and financial impacts of the External Factors; (2) actual results for the third quarter of 2023; and (3) an updated fuel cost curve. The November 2023 Long-Term Plan otherwise was prepared using assumptions consistent with the September 2023 Long-Term Plan.

| (dollars in millions) | Fiscal year ending December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
| Revenue | $2,749 | $3,160 | $3,462 | $3,843 | $4,123 | $4,358 |
| Adjusted EBITDAR[(1)] | $ (95) | $ 13 | $ 349 | $ 567 | $ 700 | $ 808 |
| Adjusted EBIT[(2)] | $ (338) | $ (244) | $ 87 | $ 293 | $ 420 | $ 518 |
|     Unlevered Cash Taxes[(3)] | $ 0 | $ 0 | $ (18) | $ (61) | $ (88) | $ (109) |
|     Depreciation & Amortization | $ 136 | $ 150 | $ 173 | $ 194 | $ 214 | $ 233 |
|     Capital Expenditures | $ (262) | $ (646) | $ (608) | $ (523) | $ (386) | $ (274) |
|     Decrease in Working Capital[(4)] | $ 109 | $ 30 | $ 145 | $ 35 | $ 33 | $ 64 |
| Unlevered Free Cash Flow | $ (355) | $ (710) | $ (221) | $ (64) | $ 193 | $ 432 |
| Tax Savings from Net Operating Loss Utilization[(5)] | $ 0 | $ 0 | $ 0 | $ 27 | $ 44 | $ 53 |

(1)  Adjusted EBITDAR is defined as earnings adjusted for interest income, interest expense, taxes, depreciation and amortization, aircraft rent expense, non-recurring operating expenses (such as changes in unrealized gains and losses on financial instruments) and one-time charges.
(2)  Adjusted EBIT is defined as Adjusted EBITDAR less depreciation and amortization and aircraft rent expense.
(3)  Unlevered Cash Taxes is defined as Adjusted EBIT multiplied by the effective tax rate. Assumes an effective tax rate of 21 percent.
(4)  Working Capital is defined as the change in operating assets and liabilities.
(5)  Assumes an 80 percent annual limitation on the offset of net operating loss carryovers against annual taxable income and an effective tax rate of 21 percent.

40.    The omission of the foregoing metrics for Adjusted EBIT, Unlevered Cash Taxes, Depreciation and Amortization, Capital Expenditures, Decrease in Working Capital, Tax Savings from Net Operating Loss Utilization, and (especially) Unlevered Free Cash Flow (as defined above, "UFCF") from the summaries of the August and September Long Term Plans deprived shareholders of crucial information pertaining to Hawaiian's value, left them unable to conduct an apples-to-apples comparison of each set of the Projections, and thus prevented them from casting fully and fairly informed votes on the Merger.

41.    Further heightening the materiality of these omitted metrics, each set was reviewed and approved by Hawaiian's Board, provided to Barclays to analyze Hawaiian's value and the merits of the prospective transaction, provided to Alaska at key moments in the negotiations process, and contained unlevered free cash flow ("UFCF") metrics for Hawaiian from 2023 through 2028. Each forecast thus (i)

played a critical role in keeping the Board reliably informed about management's distilled expectations concerning Hawaiian's ongoing performance and prospects; and (ii) formed a key part of the financial backdrop to the negotiations between Hawaiian and Alaska's leaders and advisors.

42.    Moreover, the November Long Term Plan substantially reduced certain metrics for the Company during end-stage negotiations once Alaska's final bid became clear, raising the very real possibility that Hawaiian reduced its Projections in order to obtain a fairness opinion from Barclays and induce shareholder support for a lower-than-expected bid from Alaska. And certain undisclosed cost-structure and earnings metrics in the September Long Term Plan prompted Alaska to lower its bid in October 2023, meaning that undisclosed metrics in the September Long Term Plans directly contributed to Alaska's bidding decisions.

43.    In sum, the foregoing omitted projections information was relied on the by Hawaiian's board and financial advisor, formed a key part of the financial backdrop to negotiations and Hawaiians' value, and directly impacted negotiations between Hawaiian and Alaska. The information thus possessed the highest level of materiality, and its omission from the Proxy rendered the original summaries of the August and September Long Term Plan gravely incomplete and misleading.

44.    The Supplemental Disclosures – caused by Plaintiffs efforts – fully disclosed the omitted metrics for the August and September Long Term Plans.

## August Long Term Plan (as amended in the Supplemental Disclosures)

**Financial Projections**

*The 12th paragraph and accompanying chart under the caption "Financial Projections" on page 53 is amended and restated to read as follows:*

The following table summarizes the August 2023 Long-Term Plan. Hawaiian management made various estimates and assumptions when preparing the August 2023 Long-Term Plan, including (1) growth in premium unit revenue inflation for North America travel and generally consistent revenues for international travel over the performance period; (2) certain other revenue opportunities from new products and merchandising improvements; (3) labor costs based on agreed contract terms, with labor productivity gradually advancing toward pre-pandemic levels and slower non-contract headcount growth over the performance period; (4) fuel costs based on the then-current fuel curve and an assumed one percent reduction in fuel usage over the performance period; (5) a three percent annual inflation rate applied to approximately 10 percent of overall operating expenses; and (6) certain other cost saving opportunities. The August 2023 Long-Term Plan did not include any impact of the External Events.

| [dollars in millions] | | | | Fiscal year ending December 31, | | | |
|---|---|---|---|---|---|---|---|
| | | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
| Revenue | | $ 2,823 | $ 3,211 | $ 3,441 | $ 3,828 | $ 4,107 | $ 4,330 |
| Adjusted EBITDAR(1) | | $    53 | $   233 | $   425 | $   630 | $   732 | $   812 |
| **Adjusted EBIT(2)** | | ($   189) | ($    23) | $   166 | $   357 | $   453 | $   529 |
|     Unlevered Cash Taxes(3) | | $      0 | $      0 | ($    35) | ($    75) | ($    95) | ($   111) |
|     Depreciation & Amortization | | $   136 | $   150 | $   171 | $   192 | $   212 | $   227 |
|     Capital Expenditures | | ($   264) | ($   627) | ($   558) | ($   518) | ($   374) | ($   287) |
|     Decrease in Working Capital(4) | | $   105 | $    27 | $    42 | $    28 | $    22 | $    49 |
| **Unlevered Free Cash Flow** | | ($   212) | ($   474) | ($   215) | ($    15) | $   218 | $   406 |
| **Tax Savings from Net Operating Loss Utilization(5)** | | $      0 | $      0 | $      0 | $    32 | $    45 | $    51 |
| **Unlevered Free Cash Flow (Excl. Interest Income)(6)** | | ($   262) | ($   514) | ($   237) | ($    38) | $   198 | $   386 |

(1)   Adjusted EBITDAR is defined as earnings adjusted for interest expense, taxes, depreciation and amortization, aircraft rent expense, non-recurring operating expenses (such as changes in unrealized gains and losses on financial instruments) and one-time charges.
(2)   **Adjusted EBIT is defined as Adjusted EBITDAR less depreciation and amortization and aircraft rent expense.**
(3)   **Unlevered Cash Taxes is defined as Adjusted EBIT multiplied by the effective tax rate. Assumes an effective tax rate of 21 percent.**
(4)   **Working Capital is defined as the change in operating assets and liabilities.**
(5)   **Assumes an 80 percent annual limitation on the offset of net operating loss carryovers against annual taxable income and an effective tax rate of 21 percent.**
(6)   **Adjusted for interest income for comparability with Unlevered Free Cash Flow in the November 2023 Long-Term Plan.**

## September Long Term Plan (as amended in the Supplemental Disclosures)

*The 13th paragraph and accompanying chart under the caption "Financial Projections" on page 54 is amended and restated to read as follows:*

The following table summarizes the September 2023 Long-Term Plan. The September 2023 Long-Term Plan includes updates by Hawaiian management to reflect (1) immaterial refinements; and (2) updated assumptions underlying our cargo business with Amazon. The September 2023 Long-Term Plan was otherwise prepared using assumptions that are consistent with the August 2023 Long-Term Plan. As with the August 2023 Long-Term Plan, the September 2023 Long-Term Plan did not include any impact of the External Events.

| [dollars in millions] | | | | Fiscal year ending December 31, | | | |
|---|---|---|---|---|---|---|---|
| | | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |
| Revenue | | $ 2,823 | $ 3,211 | $ 3,462 | $ 3,843 | $ 4,123 | $ 4,358 |
| Adjusted EBITDAR(1) | | $    53 | $   233 | $   463 | $   655 | $   758 | $   840 |
| **Adjusted EBIT(2)** | | ($   189) | ($    23) | $   201 | $   381 | $   478 | $   550 |
|     Unlevered Cash Taxes(3) | | $      0 | $      0 | ($    42) | ($    80) | ($   100) | ($   116) |
|     Depreciation & Amortization | | $   136 | $   150 | $   173 | $   194 | $   214 | $   233 |
|     Capital Expenditures | | ($   264) | ($   646) | ($   608) | ($   523) | ($   386) | ($   274) |
|     Decrease in Working Capital(4) | | $   118 | $    11 | $   145 | $    34 | $    32 | $    63 |
| **Unlevered Free Cash Flow** | | ($   198) | ($   508) | ($   131) | $     5 | $   238 | $   457 |
| **Tax Savings from Net Operating Loss Utilization(5)** | | $      0 | $      0 | $     1 | $    34 | $    47 | $    52 |
| **Unlevered Free Cash Flow (Excl. Interest Income)(6)** | | ($   249) | ($   548) | ($   155) | ($    22) | $   212 | $   428 |

(1)   Adjusted EBITDAR is defined as earnings adjusted for interest expense, taxes, depreciation and amortization, aircraft rent expense, non-recurring operating expenses (such as changes in unrealized gains and losses on financial instruments) and one-time charges.
(2)   **Adjusted EBIT is defined as Adjusted EBITDAR less depreciation and amortization and aircraft rent expense.**
(3)   **Unlevered Cash Taxes is defined as Adjusted EBIT multiplied by the effective tax rate. Assumes an effective tax rate of 21 percent.**
(4)   **Working Capital is defined as the change in operating assets and liabilities.**
(5)   **Assumes an 80 percent annual limitation on the offset of net operating loss carryovers against annual taxable income and an effective tax rate of 21 percent.**
(6)   **Adjusted for interest income for comparability with Unlevered Free Cash Flow in the November 2023 Long-Term Plan.**

**(ii)    The Material Disclosure of the Individual Financial Multiples Observed in Barclays *Selected Comparable Company Analysis***

45.    The Proxy failed to disclose the individual 2025E Adj. EV/EBITDAR

multiples observed for the comparable airlines studied in Barclay's Selected

14

Comparable Company Analysis of Hawaiian's value, depriving shareholders of key information considered by Barclays in that analysis.

46.     Multiples are the key input in any comparables-based financial analysis. Much like a real estate appraiser's review of comparable property sales would be fatally incomplete without discussion of the cash prices realized by the sale of those comparable properties, a comparables-based analysis is fatally incomplete without disclosure of the multiples implied by the enterprise values of the studied comparable companies.

47.     Just as a real estate appraiser's report studies the prices paid for comparable properties, an investment banker's "comparable companies analysis" studies the *financial multiples* market participants pay for comparable companies.

48.     The critical financial multiples observed by Barclays in its Selected Comparable Company Analysis were disclosed in the below chart in the Supplemental Disclosures.

**Summary of Material Financial Analyses**

*Selected Comparable Company Analysis*

*The second paragraph and accompanying chart under the caption "Summary of Material Financial Analyses – Selected Comparable Company Analysis" on page 48 is amended and restated to read as follows:*

Barclays calculated and compared various financial multiples and ratios of Hawaiian and the selected comparable companies. As part of its selected comparable company analysis, Barclays calculated and analyzed each company's ratio of its adjusted enterprise value (which we refer to as "**Adj. EV**") to its 2025 estimated earnings before interest, taxes, depreciation and amortization and aircraft rent, adjusted for non-recurring items (which we refer to as "**Adj. EBITDAR**"). The Adj. EV of each company was obtained by adding its short and long-term debt and operating lease liabilities to the sum of the market value of its common equity, the value of any preferred stock (at liquidation value) and the book value of any minority interest, and subtracting its cash and cash equivalents. All of these calculations were performed, and based on publicly available financial data (including FactSet and comparable company filings) and closing prices, as of December 1, 2023, the last trading date prior to the delivery of Barclays' opinion. The results of this selected comparable company analysis are summarized below:

| | 2025E Adj. EV/EBITDAR |
|---|---|
| American Airlines Group Inc. | 5.1x |
| Delta Air Lines, Inc. | 4.6x |
| Jetblue Airways Corporation | 4.4x |
| Hawaiian Holdings, Inc. | 3.9x |
| Southwest Airlines Co. | 3.8x |
| Alaska Air Group, Inc. | 3.8x |
| United Airlines Holdings, Inc. | 3.4x |

49.     In sum, Plaintiffs obtained material information for Hawaiian's stockholders prior to the Shareholder Vote, thereby procuring a substantial benefit for the Company's stockholders. Plaintiffs are entitled to a Mootness Fee Award reflective of that substantial benefit.

## COUNT I
## Against Defendants for an Equitable Assessment of Attorneys' Fees

50.     Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

51.     Courts have long recognized the "substantial benefit" doctrine, which authorizes an award of attorneys' fees where, as here, (i) a plaintiff stockholder's suit was meritorious when filed; (ii) the suit produced a benefit to the corporation or its stockholders; and (iii) the resulting corporate benefit was causally related to the lawsuit.

52.     A plaintiff is entitled to a presumption that a causal connection exists between the initiation of litigation and any subsequent action benefiting shareholders taken by a defendant prior to judicial resolution.

53.     The substantial benefit doctrine applies irrespective of whether a judgement was entered in favor of the class or whether a common fund was created.

54.     Given the importance of fair and informed corporate suffrage, a plaintiff has rendered a substantial service to the corporation and its shareholders if he has caused a more informed shareholder vote.

55.     Due to Plaintiffs' efforts, Defendants were caused to issue the Supplemental Disclosures.

56.     Defendants' issuance of the Supplemental Disclosures conferred a substantial benefit on Hawaiian's shareholders because it provided them with material information needed to properly evaluate the Merger and cast fully informed votes regarding same.

57.     Accordingly, Plaintiffs request an equitable assessment of attorneys' fees and expenses in connection with the substantial benefit they conferred by causing the dissemination of the Supplemental Disclosures.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment and relief against Defendants:

A.      Authorizing a Mootness Fee Award; and

17

B.     Granting such other and further equitable relief as this Court may deem just and proper.

<b><u>JURY DEMAND</u></b>

Plaintiffs pray for a jury trial on all issues and in all proceedings so triable.

Respectfully submitted this 8th day of March 2024,

**LAW OFFICES OF RODNEY BRIDGERS, L.L.L.C.**

*/s/ Rodney P. Bridgers, Jr.*
Rodney P. Bridgers, Jr.
707 Richards Street, Suite 526
Honolulu, HI 96813
Tel: (808) 321-0094
rod@helpingemployeeshi.com

*Attorney for Plaintiffs*

**OF COUNSEL**
MONTEVERDE & ASSOCIATES PC
Juan E. Monteverde
Miles D. Schreiner
Jonathan T. Lerner
The Empire State Building
350 Fifth Avenue, Suite 4740
New York, NY 10118
Tel: (212) 971-1341
jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com
jlerner@monteverdelaw.com

Attorneys for Plaintiffs